# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SANTO M. AGOSTA,** | : | **Civil No. 3:17-CV-2035** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **NANCY A. BERRYHILL,** | : | |
| **Acting Commissioner of** | : | |
| **Social Security,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

In the instant case, we are called upon to review a decision by a Social Security Administrative Law Judge ("ALJ") that found that the plaintiff, Santo Agosta, could perform sedentary work despite the fact that Agosta suffered from chronic back and shoulder pain. Agosta challenges the ALJ's determination, arguing that the ALJ erred in giving little weight to Agosta's treating physicians, who indicated that Agosta was severely limited due to his chronic pain. Agosta claims that it was error for the ALJ to assign these physicians little weight and conclude that he could perform sedentary work, even though the record suggests that Agosta had actually been working a number of different jobs in the time

period in which he claimed he was disabled and was being treated by these physicians.

Given the deferential standard of review that applies to Social Security appeals, which calls upon us simply to determine whether substantial evidence supports the ALJ's findings, we conclude that substantial evidence exists in this case which justified the ALJ's decision to deny this particular claim. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner in this case.

## II.    **BACKGROUND**

The plaintiff, Santo Agosta, is 48 years old and a high school graduate. (Tr. 38-39). He previously worked as a merchant marine, a deckhand, and a port captain. (Tr. 40-43). Beginning in 2013, Agosta saw a number of physicians for pain he was having with his back, knees, and shoulders. In March 2013, Agosta presented to Dr. John Munyak with lower back and knee pain. (Tr. 429). Dr. Munyak noted that Agosta was having trouble scheduling his physical therapy because he worked eighteen-hour days. (Tr. 429). He also recommended an MRI of Agosta's spine. (Tr. 430).

In May 2013, Agosta began seeing pain management specialist Dr. Gary Schwartz for his back, shoulder, and knee pain. (Tr. 199). Dr. Schwartz noted that Agosta had pain described as burning, constant, radiating, numbness, and that it

kept Agosta up at night. (Tr. 199). Schwartz put Agosta on pain medication and noted the possibility of steroid injections in the future. (Tr. 201). Agosta saw Schwartz again in July, complaining of lower back pain. (Tr. 191). Schwartz continued pain medications and scheduled shoulder and lumbar epidural steroid injections (ESI). (Tr. 193). Agosta received the ESIs on July 22, 2013, (Tr. 160), and reported one hundred percent improvement at a two-week follow up appointment in August. (Tr. 184).

In January 2014, Agosta saw Schwartz for lower back and shoulder pain, with Agosta rating his pain at a ten out of ten. (Tr. 171). Schwartz's examination revealed normal thoracic spine, normal range of motion, negative bilateral straight leg raise, and tenderness and decreased range of motion in the shoulders. (Tr. 172). Schwartz continued pain medications and referred Agosta to Dr. Munyak for a shoulder injection. (Tr. 173). An examination in May 2014 revealed the same back and shoulder pain, except that Agosta thought his shoulder pain was worse than his back pain. (Tr. 253). Schwartz provided him with a suprascapular nerve block injection, and referred Agosta to Dr. Erez for possible surgical intervention. (Tr. 253). Schwartz then filled out a Spinal Impairment Questionnaire, in which he opined that Agosta had limited lumbar range of motion, lumbar tenderness, cervical and lumbar muscle spasm, decreased shoulder strength, abnormal gait, and positive bilateral sitting root test. (Tr. 235-36). He concluded that Agosta should

never carry any weight secondary to bilateral shoulder pain, and that Agosta would likely be absent from work at least three days per month due to his physical impairments. (Tr. 239). Schwartz also noted that Agosta had been working at a pizza parlor during his treatment. (Tr. 239).

Agosta was seen by a state agency consultant, Dr. Manyam, in June 2014, after he had initially filed for disability benefits. Dr. Manyam's examination revealed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally in the cervical spine. (Tr. 243). There was no abnormality in the thoracic spine. (Tr. 243). Additionally, the lumbar spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (Tr. 243). There was full movement in his right shoulder and limited movement in his left shoulder. (Tr. 243). Ultimately, Manyam concluded that Agosta had mild limitations regarding prolonged standing and sitting, as well as climbing stairs, pushing, pulling, lifting and carrying weights. (Tr. 244).

Beginning in November 2014, Agosta was seen by Dr. Shalini Byadgi, his primary care physician, for his chronic pain and diabetes. (Tr. 394). Dr. Byadgi's examination revealed lumbar tenderness, normal gait, reduced shoulder range of motion, and no obvious joint deformity. (Tr. 397). At a follow up appointment on December 1, 2014, Byadgi found no lumbar tenderness, no obvious joint

deformity, and a normal gait, and she counseled Agosta on diet and exercise, as well as smoking cessation. (Tr. 388).

Agosta saw Byadgi twice in January 2015. On January 12, Agosta presented with a skin problem. (Tr. 378). It was noted that Agosta stated he could not exercise, and an examination revealed lumbar tenderness. (Tr. 378-80). Then on January 30, Byadgi's notes state that Agosta had his diabetes under control, but that he refused physical therapy because he did not have time. (Tr. 366). In February, Agosta returned to Dr. Byadgi with shoulder pain, for which she gave him a referral. (Tr. 360). She also found lumbar tenderness, slow gait, reduced range of motion and knee tenderness. (Tr. 362). Then, in March Agosta reported that he fell on his driveway. (Tr. 352). X-rays of his shoulders showed only minimal arthritis in the right shoulder, and x-rays of his spine showed degenerative arthritis with minimal osteophytes formation L3-L5 and increased sclerosis posterior facets of L5-S1. (Tr. 303-04).

In May 2015, Agosta's exams were mostly normal, with some lumbar tenderness and a limping gait reported in late May. (Tr. 321). Further, in June, despite some lumbar tenderness, Byadgi reported that Agosta's pain was being controlled with medication. (Tr. 310, 313). Agosta reported some fatigue in July, but it was noted that he had lost seven pounds due to increased activity, and that he worked at a restaurant. (Tr. 300, 306). In August and September 2015, Agosta

reported with cold symptoms, and Byadgi's examinations found no lumbar tenderness, and that he was "stable on meds" regarding his chronic pain. (Tr. 289, 295-96).

During a visit to Byadgi for medication refill in October, an exam revealed lumbar tenderness. (Tr. 281). Then, at a follow up appointment for his diabetes in November, the examination revealed lumbar tenderness and a normal gait. (Tr. 274). Finally, in December 2015, Agosta saw Byadgi for a follow up after his rotator cuff surgery, and Byadgi noted that he had not started physical therapy, but would start soon. (Tr. 263).

Dr. Byadgi filled out a Disability Impairment Questionnaire on January 16, 2016. (Tr. 514). It was her opinion that Agosta could only sit and stand for one hour out of an eight-hour workday, and that he would likely be absent at least one day per month due to his physical impairments. (Tr. 516, 518). She also found that Agosta could occasionally lift and carry twenty pounds, and could frequently lift and carry ten pounds. (Tr. 516). Further, she suggested that Agosta would have to take frequent, unpredicted breaks at work due to some interference with his concentration and attention. (Tr. 516-17).

Agosta was seen by Dr. Nicholas Slenker on November 20, 2015, with a chief complaint of shoulder pain. (Tr. 446). Slenker noted that Agosta had been painting on a ladder at work on November 18, and slipped and fell about eight feet

onto a windowsill. (Tr. 446). An MRI revealed a comminuted transverse fracture in his right upper extremity. (Tr. 452). Additionally, an MRI of Agosta's spine revealed no acute abnormality of the cervical spine, and only mild disc protrusions. (Tr. 455). Agosta had shoulder surgery in December 2015. (Tr. 457).

Agosta initially filed for Social Security disability benefits on March 31, 2014, claiming that he became unable to work in August 2013 due to his disabling condition. (Tr. 103). The initial determination was that the plaintiff was not disabled. (Tr. 73). Agosta then requested a hearing in front of an ALJ, which was held on March 2, 2016. (Tr. 33-65). At the hearing, Agosta testified that his chronic back pain forced him to stop working, he could not sit or stand for long periods of time, and that he had a hard time walking more than a half of a block at a time without resting. (Tr. 43, 46-47). He testified that he gets pains in his feet from his neuropathy. (Tr. 46,). He also mentioned that he had surgery on his right rotator cuff, and that he needed surgery on his left shoulder. (Tr. 48).

Regarding his daily life activities, Agosta stated that he lived with his wife and three children. (Tr. 38). He testified that he used to cook for his family, but that his wife did most of the cooking now, as he could not do anything because of his depression. (Tr. 51). However, he stated that he did go to the grocery store with his wife, using a motor chair. (Tr. 52). Agosta noted that he needed help getting

dressed in the morning, partly because of his depression and also because of his inability to bend. (Tr. 53-54).

A vocational expert testified at the hearing. The ALJ asked the expert the following hypothetical:

> I'll have you assume a hypothetical individual of the Claimant's age and education with the past jobs that you've described. And then for the first hypothetical, assume this individual is limited to light exertion. In addition, he must have the option to alternate between standing every 15 minutes. There's a manipulative limitation. He can occasionally reach overhead bilaterally. Postural limitations, he could occasionally climb ramps and stairs. Can never climb ladders, ropes and scaffolds. Can never balance, occasionally stoop. Never kneel, occasionally crouch . . . never crawl . . . He must avoid exposure to unprotected heights, moving mechanical parts and vibration.

(Tr. 60-61). The vocational expert testified that this hypothetical individual could perform work such as an assembler of small products and a general cashier. (Tr. 61-62). The ALJ then further limited the hypothetical to sedentary exertion, and the vocational expert testified that the individual would be able to perform the jobs of a switchboard operator, a telephone solicitor, and an assembler of small products. (Tr. 62). Finally, the ALJ asked if such an individual, if he would be "off task 20 percent of the time of an eight workday," would be able to perform any work, to which the vocational expert responded that he could not. (Tr. 63).

On June 2, 2016, the ALJ issued an unfavorable decision, and determined that Agosta was not disabled and could perform sedentary work. (Tr. 15). In reaching this decision, the ALJ found at Step 1 of the sequential analysis which

applies to Social security disability appeals that Agosta met the insured requirements of the Act. (Tr. 19). At Step 2, the ALJ concluded that Agosta suffered from a number of severe impairments, including rotator cuff tear, degenerative disc disease, lumbar disease, osteoarthritis, diabetes and neuropathy. (Tr. 19). The ALJ determined, however, at Step 3 of this sequential analysis that none of Agosta's impairments met a listing requirement which would have defined him as *per se* disabled. (Tr. 20-1).

The ALJ then found that Agosta retained the residual functional capacity to perform a limited range of sedentary work despite these impairments. (Tr. 21). In reaching this conclusion the ALJ weighed all of the clinical and medical opinion evidence and assessed this evidence in light of Agosta's reported activities of daily living. (Tr. 21-6.) On this score, Agosta's self-reported activities of daily living included a number of instances in which Agosta described working at various occupations, both before and after the date of the alleged onset of his disability in August of 2013. For example, in March 2013, Agosta reported to John Munyak, M.D., that he was "working 18 hour days." Between May 2013 and May 2014, Agosta treated with Gary Schwartz, M.D., because it was "difficult to perform his duties as a cook secondary to his pain." In April 2014, when Agosta sought treatment for high blood sugar, the medical records indicated that he "[w]ork[ed] in a pizzeria." One month later, in a May 2014 medical opinion, Dr. Schwartz stated

that Agosta "has held a job at a pizza parlor for the time of my treatment." Likewise in January 2015, Agosta reported to Shalini C. Byadgi, M.D., that he "cannot exercise and is a chef and [it is] hard to eat healthy." By November 2015, some four months prior to his March 2016 administrative hearing, Agosta listed his occupation as "construction/painter," and sought treatment for a shoulder injury he sustained while he "was at work . . . painting while standing on a ladder."

After carefully reviewing this clinical evidence and Agosta's own self-reported work activities, the ALJ concluded that the opinions of the treating sources—a pain management specialist, Dr. Schwartz; a primary care physician, Dr. Byadgi; and an orthopedic provider, Dr. Slenker—were entitled to little weight. The ALJ reached this conclusion guided, in part, by the fact that Agosta was describing on-going employment to these doctors at the very time that they were opining that he was incapable of productive labor. (Tr. 21-26). The ALJ also afforded only partial weight to the opinion of the state agency consultant, Dr. Manyam, who had opined that Agosta suffered from only mild restrictions on his activities, concluding that this opinion somewhat overstated Agosta's residual functional capacity. (Id.)

Having made these credibility determinations, the ALJ then fashioned a limited, sedentary residual functional capacity assessment for Agosta which gave him the benefit of every medical doubt, consistent with the evidence which

suggested that Agosta had actually worked in a number of culinary and construction professions after the alleged onset of his disability. The ALJ then concluded at Step 4 of this sequential analysis that Agosta could not perform his past relevant work, but found at Step 5, consistent with the vocational expert's testimony, that there were a significant number of jobs in the regional and national economy that Agosta could still perform. (Tr. 27-8). On the basis of these findings the ALJ determined that Agosta had not met the stringent standard for establishing disability, and denied his claim for disability benefits. (Id.)

Agosta appealed the ALJ's decision to the Appeals Council, and his request for review was denied on September 5, 2017. (Tr. 1). Agosta subsequently filed this action in the district court on November 6, 2017, arguing that the Commissioner's denial of Social Security disability benefits was contrary to law, primarily because the ALJ had erred in evaluating the treating source medical opinions and had fashioned an RFC which lacked the requisite medical support. This appeal is fully briefed by the parties and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner, which is consistent with Agosta's own activities of daily living and self-reported work history.

## III.  DISCUSSION

### A.  Substantial Evidence Review – the Role of the Administrative Law Judge and the Court

Resolution of the instant social security appeal involves an informed consideration of the respective roles of two adjudicators–the ALJ and this court. At the outset, it is the responsibility of the ALJ in the first instance to determine whether a claimant has met the statutory prerequisites for entitlement to benefits. To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); see also 20 C.F.R. § 404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment;

(3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. § 404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that he experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an

assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in a factual setting where a factually-supported and well-reasoned medical source opinion regarding limitations that would support a disability claim is rejected by an ALJ based upon a lay assessment of other evidence by the ALJ. In contrast, when an ALJ fashions an RFC determination on a sparse factual record or in the absence of any competent medical opinion evidence, courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon

all of the facts and evidence. See Titterington, 174 F. App'x at 11; Cummings, 129 F. Supp. 3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her from engaging in any of his or her past relevant work. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 404.1512; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Once the claimant has met this burden, it shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. § 404.1512(f); Mason, 994 F.2d at 1064.

Once the ALJ has made a disability determination, it is then the responsibility of this court to independently review that finding. In undertaking this task, this court applies a specific, well-settled and carefully articulated standard of review. In an action under 42 U.S.C. § 405(g) to review the decision of the Commissioner of Social Security denying Plaintiff's claim for disability benefits, Congress has specifically provided that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive[.]" 42 U.S.C. § 405(g). Thus, when reviewing the Commissioner's final decision denying a claimant's application for benefits, this court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064.

But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). The

question before this court, therefore, is not whether a plaintiff is disabled, but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in

his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999). Moreover, in conducting this review we are cautioned that "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." Frazier v. Apfel, No. 99-715, 2000 WL 288246, *9 (E.D. Pa. March 7, 2000) (quoting Walters v. Comm'r of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997)); see also Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991) ("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility."). Furthermore, in determining if the ALJ's decision is supported by substantial evidence, the court may not parse the record but rather must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

In order to aid ALJs in this task of assessing claimant credibility, Social Security Rulings and Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 SSR LEXIS 4. First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §

404.1529(b); SSR 96-7p, 1996 SSR LEXIS 4. During this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 SSR LEXIS 4. This includes, but is not limited to: medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id. See George v. Colvin, No. 4:13-CV-2803, 2014 U.S. Dist. LEXIS 150897, 2014 WL 5449706, at *4 (M.D. Pa. Oct. 24, 2014); Cano-Martinez

v. Colvin, No. 3:14-CV-1090, 2015 U.S. Dist. LEXIS 132233, 2015 WL 5781202, at *8-9 (M.D. Pa. Sept. 30, 2015).

### B. Legal Benchmarks for the ALJ's Assessment of Medical Treatment and Opinion Evidence

The Commissioner's regulations also set standards for the evaluation of medical evidence, and define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2) (effective Aug. 24, 2012, through Mar. 26, 2017).[1] Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. § 404.1527(c).

In deciding what weight to accord to competing medical opinions and evidence, the ALJ is guided by factors outlined in 20 C.F.R. § 404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR

---

[1] Some of the applicable regulations been revised since the ALJ issued his decision in this case. For instance, definition of "medical opinions," contained in 20 C.F.R. § 404.1527(a)(2) of the prior regulation is now designated as § (a)(1) in the revised regulation. Throughout this opinion, the court cites to the version of the regulations in effect at the time the ALJ rendered his decision. Although the revised regulations may be worded slightly differently, the changes have no effect on the outcome of this case.

96-6p, 1996 SSR LEXIS 3 at *5, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally are entitled to more weight. See 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. § 404.1502 (effective June 13, 2011, through Mar. 26, 2017) (defining "treating source"). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); see also SSR 96-2p, 1996 SSR LEXIS 9, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c).

At the initial level of administrative review, state agency medical and psychological consultants may act as adjudicators. See SSR 96-5p, 1996 SSR LEXIS 2 at *16, 1996 WL 374183 at *4. As such, they do not express opinions; they make findings of fact that become part of the determination. Id. At the ALJ and Appeals Council levels of the administrative review process, however, findings by nonexamining state agency medical and psychological consultants should be evaluated as medical opinion evidence. 20 C.F.R. § 404.1527(e) (effective Aug. 24, 2012, through Mar. 26, 2017). As such, ALJs must consider these opinions as expert opinion evidence by nonexamining physicians and must address these opinions in their decisions. SSR 96-5p, 1996 SSR LEXIS 2 at *15, 1996 WL 374183 at *6. Opinions by state agency consultants can be given weight "only insofar as they are supported by evidence in the case record." SSR 96-6p, 1996 SSR LEXIS 3 at *6, 1996 WL 374180 at *2. In appropriate circumstances, opinions from nonexamining state agency medical consultants may be entitled to greater weight than the opinions of treating or examining sources. 1996 SSR LEXIS 3 at *6-7, [WL] at *3.

Furthermore, as discussed above, it is beyond dispute that, in a social security disability case, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. This principle applies with particular force to the opinions and treating records of

various medical sources. As to these medical opinions and records: "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quoting Mason, 994 F.2d at 1066)); see also Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).

Oftentimes, as in this case, an ALJ must evaluate medical opinions and records tendered by both treating and non-treating sources. Judicial review of this aspect of ALJ decision-making is guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ — not treating or examining physicians or State agency consultants — must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, "[w]here . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales, 225 F.3d at 317 (quoting Plummer, 186 F.3d at 429)). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

In making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an
> opinion without crediting the entire opinion. See

> Thackara v. Colvin, No. 1:14-CV-00158-GBC, 2015 U.S. Dist. LEXIS 35646, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F.Supp.2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96-2p, 1996 SSR LEXIS 9 does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10-CV-197-PB, 2011 U.S. Dist. LEXIS 62329, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14-CV-00158-GBC, 2015 U.S. Dist. LEXIS 35646, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).

It is against these legal guideposts that we assess the ALJ's decision in the instant case.

## C.    The ALJ's Determination is Supported by Substantial Evidence

This case presents a singular circumstance. The plaintiff asserts that the ALJ erred in concluding that he was not disabled, even though his medical records indicate that Agosta reported working on numerous occasions during the time when he claimed he was totally disabled. Agosta argues in this appeal that the ALJ erred in his determination that Agosta could perform sedentary work. He contends that the ALJ's decision to give little weight to the opinions of his treating physicians was in error. After a thorough review of the administrative record, it is clear that the ALJ's opinion meets the benchmarks prescribed by law. The ALJ's determination that Agosta was not disabled is supported by substantial evidence in

the record, and the ALJ gave a reasoned explanation for his decision to afford these medical opinions little weight based upon Agosta's own reported work activities.

At the outset, we note that the ALJ had opinions from four different physicians to consider—a pain management specialist, Dr. Schwartz; a primary care physician, Dr. Byadgi; the state agency consultant, Dr. Manyam; and an orthopedic provider, Dr. Slenker. With these opinions came a number of documents, detailing Agosta's chronic shoulder and back pain, as well as other physical issues he had, from 2013 to 2016. These documents also recorded Agosta's on-going employment in various industries.

The ALJ gave Dr. Schwartz's Spinal Impairment Questionnaire little weight because it was inconsistent with the record as a whole, as well as inconsistent with Agosta's activities of daily living. Dr. Schwartz opined that Agosta had limited lumbar range of motion, lumbar tenderness, cervical and lumbar muscle spasm, decreased shoulder strength, abnormal gait, and positive bilateral sitting root test. (Tr. 235-36). He concluded that Agosta should never carry any weight secondary to bilateral shoulder pain, and that Agosta would likely be absent from work at least three days per month due to his physical impairments. (Tr. 239).

In affording this opinion little weight, the ALJ noted that, in October 2013, Agosta displayed no agitation, his straight leg raise was negative bilaterally, his sensation was intact bilaterally to light touch, and motor strength was 5/5

bilaterally. (Tr. 172). Agosta also received injections to help with his back pain, and his pain improved with medication, which allowed Agosta "to work on a daily basis." (Tr. 171, 180). It was noted that despite Agosta's complaint of knee pain, x-rays showed no significant bony abnormality. (Tr. 24). Further, the ALJ indicated that an emergency room visit in April 2014 revealed that Agosta was working at a pizzeria, and that his wife reported that he was "very active on a daily basis." (Tr. 203). Finally, Dr. Schwartz stated on the questionnaire that Agosta "has had a job at a pizza parlor for the time of my treatment," (Tr. 239), which is inconsistent with Agosta's testimony that he had stopped working. Thus, we find that the ALJ's explanation for why he gave little weight to Dr. Schwartz's opinion is supported by substantial evidence in the record.

Dr. Byadgi was Agosta's primary care physician, and whose opinion the ALJ also afforded little weight. Dr. Byadgi completed a Disability Impairment Questionnaire in January 2016, in which she opined that Agosta could only sit and stand for one hour out of an eight-hour workday, and that Agosta would likely be absent at least one day per month due to his physical impairments. (Tr. 516, 518). Dr. Byadgi also found that Agosta could occasionally lift and carry twenty pounds, and could frequently lift and carry ten pounds. (Tr. 516). Further, she suggested that Agosta would have to take frequent, unpredicted breaks at work due to some interference with his concentration and attention. (Tr. 516-17). However, Byadgi's

notes of treatment suggest that Agosta's mobility and activity actually increased throughout his treatment. Her notes from January 2015 state that Agosta needed to lose weight, "but claims he cannot exercise and is a chef and [it is] hard to eat healthy." (Tr. 379). However, in April 2015, her prescribed weight management plan was for Agosta to "walk daily." (Tr. 339). Then in May 2015, the notes state that Agosta "will walk 3 days per week" for weight management. (Tr. 331). Finally in July 2015, Dr. Byadgi noted that Agosta had lost seven pounds and was "trying to lose weight by diet/increased activity." (Tr. 300). It was also noted that Agosta was working at a restaurant at that time. (Tr. 306).

Given this record, we conclude that the ALJ's decision to afford Dr. Byadgi's opinion little weight is supported by substantial evidence. The ALJ reasoned that he was giving the opinion little weight because it was inconsistent with the record as a whole and was not explained. The opinion was also inconsistent with Agosta's daily activities, as Byadgi's own notes evidence that Agosta was working at the time he was being treated, and that his activity level increased throughout his treatment.

In addition to his treating physicians, Agosta also saw a state agency consultant and an orthopedic provider. The state agency consultant, Dr. Manyam, examined Agosta in June 2014. His examination revealed that Agosta's cervical spine showed full flexion, and that there was no abnormality in the thoracic spine.

(Tr. 243). He also noted some limited movement in Agosta's left shoulder, but that Agosta's strength in his upper and lower extremities was 5/5. (Tr. 243). Ultimately, Dr. Manyam opined that Agosta had mild limitations to prolonged standing and sitting, climbing stairs, lifting and carrying. (Tr. 244). The ALJ gave only partial weight to Dr. Manyam's examination. He reasoned that Dr. Manyam only saw Agosta on one occasion, was not familiar with the entire case record, and did not provide specific limitations. (Tr. 25-26). In reaching this conclusion, which favored Agosta's disability application, the ALJ gave Agosta the benefit of every reasonable medical doubt on a record which showed that Agosta was actually working when he claimed to be totally disabled. There was no error in this assessment.

Agosta also saw an orthopedic provider, Dr. Slenker, in November 2015. Agosta presented to Dr. Slenker with shoulder pain after he had fallen from a ladder while painting. (Tr. 446). Dr. Slenker's notes state that the injury occurred while Agosta was at work. (Tr. 448). The limited opinion that Agosta was not able to return to work temporarily was given only little weight, as the ALJ found that the opinion did not appear to pertain to Agosta's overall abilities. (Tr. 25).

After a review of the entire administrative record, we find that there is substantial evidence to support the ALJ's determination that Agosta was not disabled. The objective medical evidence conflicts not only with Agosta's own

statements about his physical ailments, but with the questionnaires of the treating physicians. Both treating physicians opined that Agosta's physical injuries severely limited his ability to work. However, the medical records show that Agosta's pain was being managed by medication, and that his exercise and activity increased throughout his treatment.

Moreover, and significantly, the record indicates that Agosta was working several jobs at the time he was being treated by these physicians. Dr. Munyak, who saw Agosta in 2013, indicated that Agosta was having an issue scheduling physical therapy "due to his time working 18 hour days." (Tr. 429). Dr. Schwartz noted that Agosta was working at a pizza parlor during the time of his treatment, which was in 2013 and 2014. (Tr. 239). Dr. Byadgi's notes state that Agosta was working at a restaurant in July 2015. (Tr. 306). Further, Agosta only saw Dr. Slenker in November 2015 because of a work-related injury, where he fell off a ladder while he was painting. (Tr. 448). This belies Agosta's testimony that he had stopped working in 2013 because of his physical ailments, and contradicts the opinions of the physicians who suggested that Agosta was not able to work.

Given the many inconsistencies between the treating source opinions and the treatment records, under the deferential standard of review which applies to appeals of Social Security disability determinations, we conclude that substantial evidence supported the ALJ's decision to afford the treating sources opinions little

weight. Further, we conclude that there is substantial evidence to support the determination that Agosta could perform sedentary work.

## IV.   <u>CONCLUSION</u>

In sum, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant like the plaintiff can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence could have been further explained, or might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations we conclude that substantial evidence supported the ALJ's evaluation of the evidence in this case. Therefore, we will affirm this decision, direct that judgment be entered in favor of the defendant, and instruct the clerk to close this case.

An appropriate order follows.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: October 25, 2018